### THE TEXAS.

### THE JAMES McCAULLEY.

(District Court, D. Delaware. July 30, 1913.)

### No. 730.

COLLISION (§ 102*)—STEAMSHIP AND TOW MEETING IN FOG—VIOLATION OF SPEED AND NARROW CHANNEL RULES.

A collision occurred in the Delaware river between a steamship downbound and a schooner passing up in tow of a tug by hawser. There was a fog and both steamship and tug were sounding proper fog signals. The steamship was in about the middle of the channel while the tug and tow were on the western side of the river. *Held*, on the evidence, that the steamship was in fault for not reducing speed when she heard or should have heard the fog signal of a towing vessel ahead which she could not see, as required by article 16 of the Inland Rules, 30 Stat. 96 (U. S. Comp. St. 1901, p. 2880); that the tug was also in fault in that, although there was a fog which increased the danger of collisions, she was with a tow on a long hawser on the wrong side of the channel without necessity, in violation of article 25 of such rules, which applies to towing tugs as well as other steam vessels.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 102.*]

In Admiralty. Suit for collision by Walter M. Ervin, Master of the Schooner Dorothy B. Barrett, against the steamship Texas and the

tug James McCaulley, brought in under admiralty rule 59. Decree against both steamship and tug, each for half damages.

Ward, Gray & Neary, of Wilmington, Del., for libelant.

H. Alan Dawson, of Philadelphia, Pa., and Leonard E. Wales, of Wilmington, Del., for the steamship Texas.

John F. Lewis and Francis C. Adler, both of Philadelphia, Pa., for tug McCaulley.

BRADFORD, District Judge. This suit was instituted by Walter M. Ervin, master of the schooner Dorothy B. Barrett, by the filing of a libel in rem against the Norwegian steamship Texas for the recovery of damages sustained by the former from a collision with the latter in the Delaware river December 20, 1906. All injury that was inflicted was sustained by the Barrett. Subsequently, on the petition of the Texas, the tug James McCaulley was brought in as a party respondent under rule 59 in admiralty. The collision occurred shortly after two o'clock in the afternoon not far from Marcus Hook and while the Barrett was in tow of the McCaulley. The weather, though unsettled, was not stormy; but at and for some time prior to the collision fog more or less dense prevailed on the river necessitating the use of fog signals. The Texas was proceeding down the river in charge of a duly licensed pilot of long experience on the Delaware river and bay. The Barrett in tow of the McCaulley was proceeding up the river on her way to Philadelphia without cargo and light. She was not attached to the tug save by a towing line as to the length of which there is considerable diversity of evidence. The proverbial conflict of mariners' testimony in collision cases is strikingly displayed here as to the density of the fog, the giving of proper signals, the distance between the steamship and the tug and her tow when first seen or heard, the positions of the vessels with respect to the channel of the river, the courses or directions they were respectively pursuing prior to the collision, and many other points deemed by the proctors of the several parties of more or less importance to a proper determination of the cause.

No contention has been made that the collision was the result of accident unaccompanied by culpable fault. In view of the evidence such a claim would be wholly inadmissible. Further, the evidence does not disclose actionable or substantial negligence on the part of the Barrett. In fact the Texas admits as much; for her proctors in their brief say:

"We doubt very much whether in law the schooner can be condemned for these faults [some supposed minor faults] and in our judgment the tug is wholly responsible for the collision."

The inquiry, therefore, is whether the collision was due to fault on the part of both the steamship and the tug, and if not, of which of the two. A careful examination of the evidence in connection with the briefs of the proctors has led me to the conclusion that the Texas was in fault. It appears from the evidence, direct and circumstantial,

when taken as a whole, that the Texas as she was approaching the Barrett shortly before the collision and until it became imminent was proceeding down the river not far from the center of the channel and approximately parallel to the Pennsylvania or, as it has been termed, the western shore, and that she duly conformed to the requirements of subdivision (a) of article 15 of the pilot regulations that in case of fog "a steam-vessel under way shall sound, at intervals of not more than one minute, a prolonged blast." Nor do I place any reliance upon the reckless testimony adduced on the part of the Barrett and the tug that the Texas ported her helm, swung to starboard, and headed toward the Pennsylvania shore almost at right angles, maintaining a speed of from six to ten knots through the water and thus causing the collision. That Teal, an old and experienced pilot, thoroughly familiar with the channels and waters of the Delaware river and bay, should have directed, while in his right mind and without any perceptible reason, such a suicidal course on the part of the Texas is not to be accepted for an instant. The circuit court of appeals for the third circuit in The Menominee, 197 Fed. 736, 117 C. C. A. 130, used language very suggestive on this point, as follows:

"That an old and experienced pilot like Schellinger who was thoroughly acquainted with the navigable channels of the Delaware should without the slightest cause and while in his senses (and there is no evidence that he was not in full possession of his faculties) should have executed or intended such a maneuver is incredible in the absence of evidence of such quality and strength as to be conclusive on the point."

But article 16 of the pilot rules provides that:

"Every vessel shall, in a fog * * * go at a moderate speed, having careful regard to the existing circumstances and conditions."

I am satisfied from the evidence that for some time before the Texas came in proximity to the Barrett and the tug the latter vessel duly complied with article 15 of the pilot rules requiring that "a steam-vessel when towing, shall, instead of the signals prescribed in subdivision (a) of this article, at intervals of not more than one minute, sound three blasts in succession, namely, one prolonged blast followed by two short blasts"; and that the fog whistle of the tug was loud and strong and either was heard by those on the Texas or should have been heard by them, had they been paying the attention the circumstances demanded, considerably before either the tug or the Barrett became visible. This was plain notice to the Texas that she was approaching a steam vessel having a tow and imperatively required the exercise of the utmost vigilance and caution on her part. Notwithstanding the testimony of those on the Texas that she was making little or no headway through the water at and for some time prior to the collision the weight of the evidence, including not only the direct testimony of witnesses but the force with which the Barrett was struck by the Texas as shown by the amount of repairs rendered necessary, establishes the fact that the Texas was moving at an improper and dangerous rate of speed which had a direct causal connection with

the collision. I see no reason why the second paragraph of article 16 of the pilot rules was not applicable to the Texas. It provides:

"A steam-vessel, hearing, apparently forward of her beam, the fog signal of a vessel, the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

It is argued on the part of the Texas that the tug had the former vessel on her starboard side and consequently was obliged to keep out of her way. But on this point it should be observed not only that the tug had the Barrett in tow, but the fog was of such a character as to render the rule inapplicable by obscuring the course if not the bearings of the vessels with respect to each other. If the Texas had promptly adopted the proper precautions as soon as the fog signal of the tug was or should have been heard by the Texas the latter vessel would not have been at fault. But this she failed to do and accordingly must bear the consequences.

The evidence also satisfies me that the tug was at fault. In her answer it is set forth that "at the time of meeting the said steamship Texas the tug McCaulley and her tow were at the extreme western edge of the navigable part of the river." Article 25 of the pilot rules provides:

"In narrow channels every steam-vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

And article 27 provides:

"In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

Article 25 clearly applies to the portion of the channel in which the collision occurred. The tug was proceeding with her tow on the wrong side of the channel in direct violation of that article. It would have been "safe and practicable" within the meaning of the rule for the tug to keep on the starboard side of the channel in going up the river. Nor were there any "special circumstances" rendering a departure from the rule "necessary in order to avoid immediate danger." The fact that the tug was towing the Barrett did not confer a privilege on the former vessel to pursue a course on the port side of the channel in violation of the sailing regulations. It would have been no more unsafe for the tug with her tow to pass up the river on the starboard side of the channel than it would have been for the Texas to pass down the river on that side. Yet it would have been a fault of the Texas to so pass down the river, whereas it would have been altogether proper for the tug and her tow to pass up the river on that side. The circumstance that the tug was a towing vessel gave her no right to force the Texas from the proper side of the channel in descending the river or to adopt an illegal course for the purpose of seeing the land. If a sight of the land was necessary to the safety of navigation under the circumstances it was quite as important that

the Texas should have that sight as the tug. The tug with its tow being on the wrong side, it was especially incumbent on her to observe great vigilance and care to avoid collision. The Taurus (D. C.) 156 Fed. 838. The tug was not lashed to the side of the Barrett, but connected with her by a towing line of 50 or 60 fathoms in length, if not longer. The danger and impropriety of using such a line in a fog and on the wrong side of the channel must be apparent, and have been judicially recognized on one or more occasions. The tug had no right to place herself and her tow on the wrong side of the channel in a fog, and to do so without being attached to the tow by lashing or otherwise in such a manner as to control the movements of the latter from swinging with the tide or otherwise was inexcusable. Had she been so attached to the Barrett she could upon the approach of danger from the oncoming steamer in all human probability have prevented the collision by forthwith reversing and proceeding full speed astern. There is much conflicting testimony as to signals and courses, but it is unnecessary to pursue the subject further. The total damages and costs must be borne equally by the Texas and the McCaulley. Let an interlocutory decree in accordance with this opinion be prepared and submitted.